## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

BANK OF AMERICA, N.A. Successor by                    CASE NO:   15-cv-81325
Merger to BAC HOME LOANS
SERVICING LP, f/k/a COUNTRYWIDE
HOME LOANS SERVICING

      Plaintiff,

vs.

GARY L. ZASKEY a/k/a Gary Lynn Zaskey;
LORI A. ZASKEY a/k/a Lori Ann Zaskey;
BRENDA LYNN ZASKEY; UNKNOWN SPOUSE
OF BRENDA LYNN ZASKEY; et al.

      Defendants.
_____/

GARY L. ZASKEY and LORI A. ZASKEY

      Counter-Plaintiffs

vs.

BANK OF AMERICA, N.A.,
GREEN TREE SERVICING, LLC, HARBOR LAND TITLE, L.C.
and OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPANY

      Counter-Defendants
_____/

## COUNTER-PLAINTIFFS' RESPONSE IN OPPOSITION TO GREEN TREE'S MOTION FOR SUMMARY JUDGMENT

Defendants/Counter-Plaintiffs, GARY L. ZASKEY and LORI A. ZASKEY, (hereinafter

"the Zaskeys") by and through their undersigned attorney, hereby file this Response in Opposition

to Counter-Defendant GREEN TREE SERVICING, LLC's ("Green Tree") Motion for Summary

Judgment (D.E. 209), and in response state the following:

## INTRODUCTION

On July 8, 2016, Green Tree filed a Motion for Summary Judgment (D.E. 209), in which Green Tree contends it is entitled to summary judgment on all claims raised by the Zaskeys in their Fourth Amended Counterclaim. For the reasons stated below, Green Tree's motion for summary judgment should be denied.

## STATEMENT OF MATERIAL FACTS REGARDING GREEN TREE

The Zaskeys' claims arise following a short sale which closed on April 26, 2012. (G. Zaskey Dep 88:22-23 and Ex. 12.) Under the terms of the two letters detailing the short-sale agreement, Bank of America was to receive wired proceeds in the amount of $26,788.44, in full satisfaction of the Note and Mortgage it held on the subject property in Palm Beach County, Florida, and the Zaskeys were to receive $5,000.00 in relocation assistance conditioned on their full compliance and performance of the terms and obligations under the short sale agreement. (G. Zaskey Dep., Ex. 10 and 11.)

On or about April 26, 2012, Harbor Land Title, LLC (Harbor Title), the closing agent, attempted to wire the short sale proceeds to Bank of America. (Sadik Dep. 30:14-17.) However, for reasons unknown, the wire transfer was not completed.  On May 3, 2012 the Zaskeys received the $5,000.00 in relocation assistance. (G. Zaskey Dep., 87:5-7; 100:15-23.)

On August 9, 2012, Harbor Title successfully wired Bank of America the proceeds from the Zaskeys' short sale closing in the amount of $26,788.44. (Sadik Dep. 30:18-24.) On August 16, 2012, Bank of America returned these funds to Harbor Title (Sadik Dep. 30:18-24.) Despite the Zaskeys' full performance of their obligations under the short-sale agreement, Bank of America returned the short sale proceeds without explanation, and without contacting the owner of the loan, Fannie Mae, to determine whether it would accept the proceeds. The next month Bank

of America filed a foreclosure action against the Zaskeys. (Decl. of G. Zaskey, ¶ 7-12 and D.E. 142, p. 75 of 98.) No one, including Green Tree, ever informed the Zaskeys that Bank of America had rejected the short sale proceeds. (Decl. of G. Zaskey, ¶ 7.) The Zaskeys believed Bank of America received the proceeds from the closing in full satisfaction of the note and mortgage. (Decl. of G. Zaskey, ¶ 7.) Even when Bank of America and Green Tree initiated collections actions, neither ever informed the Zaskeys either by written notice or by telephone call that Bank of America had rejected the short-sale proceeds. (Decl. of G. Zaskey, ¶ 8.)

For two and one half years, Bank of America and Green Tree both failed to properly credit the Zaskeys' account, improperly refused to accept the short sales proceeds, and instead proceeded with aggressive and harassing debt collection campaigns against the Zaskeys. (Decl. of G. Zaskey, ¶ 13-26.) While the Zaskeys repeatedly explained to Bank of America, Green Tree, and their representatives from various collection agencies that the approved short-sale had taken place, neither Bank of America nor Green Tree conducted a good faith investigation into the Zaskeys' dispute of the debt which should have been satisfied after a lender-approved short sale had closed. Or, if they did conduct such an investigation, neither informed the Zaskeys that Bank of America had rejected the short sale proceeds. (Decl. of G. Zaskey, ¶ 13-26.)

Subsequently, Harbor Title contacted Green Tree, which on May 1, 2013 assumed the servicing of the Zaskeys' loan, and asked a representative named Mario to accept a wire transfer of the short sale proceeds in full satisfaction of the Zaskeys' debt, and in accordance with the Zaskeys' short sale agreement. (Sadik Dep. 31:1-20; 33:12-23.) Green Tree refused the funds, refused in any way to acknowledge the April 26, 2012 short sale closing, and instead demanded the Zaskeys either again short sale the property which they no longer owned, or pay the debt in full in the amount of $99,327.02. (Sadik Dep. 31:1-20; 33:12-23.)

These short sale proceeds remained in the possession of Harbor Title until November 26, 2013, at which time Harbor Title transferred the proceeds to Old Republic. (Sadik Dep., Ex. C; Roberts Dep. 16:14-18.) Old Republic then maintained possession of the funds for nine months. (Roberts Dep. 16:19-22.) On August 27, 2014, Old Republic transferred the short sale funds in the amount of $26,788.44 to Green Tree. (Roberts Dep. 16:19-22.)

Two months later, on October 29, 2014 Green Tree recorded a Satisfaction of Mortgage regarding the Zaskeys' note and mortgage. (D.E. 142-1, page 24 of 37.) Nine months later on July 21, 2015, Bank of America filed a notice of voluntary dismissal, dismissing its foreclosure action with prejudice. (D.E. 142-1, page 28 of 37.) Both Green Tree and Bank of America took these actions without informing the Zaskeys they would do so, without the Zaskeys signing any additional closing documents, and without the Zaskeys contributing any money toward the debt Bank of America and Green Tree sought to collect.

## ARGUMENT

### I.     STANDARD OF REVIEW

The burden of a movant seeking relief pursuant to Fla. R. Civ. P. 56 is well known.  The movant must bring forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

### II.    THE ZASKEYS WITHDRAW THEIR FDUTPA CLAIM.

After reviewing the case law cited in Green Tree's motion for summary judgment, and after conducting their own independent research on this issue, the Zaskeys agree with Green Tree's analysis, and withdraw their FDUTPA claim against Green Tree.

### III.   GREEN TREE IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE ZASKEYS' FDCPA CLAIM.

In its Motion, Green Tree raises numerous arguments in support of summary judgment on the Zaskeys' FDCPA claim. (D.E. 209) For ease of reference, the Zaskeys will respond to each argument in the same format utilized by Green Tree

First, Green Tree is not entitled to summary judgment, because the underlying loan in this case was primarily for "personal, family or household" purposes. (D.E. 209, p. 9.) While Green Tree and Bank of America argue the underlying loan was taken out on Mr. Zaskeys' "rental" property - that is simply not the case.

This argument is based on a misrepresentation of Mr. Zaskey's deposition testimony. During his deposition, Mr. Zaskey testified he purchased the subject property in 1976, and moved into the property shortly thereafter. (G. Zaskey Dep. 9:14-23.) Mr. Zaskey lived there from 1976 to 1983, and moved out after his daughter was born. (G. Zaskey Dep. 9:24 - 10:4.) Mr. Zaskey maintained the property (a 900 square foot triplex) as a second home after moving out. (G. Zaskey Dep. 10:5-18.) Mr. Zaskey testified that after he went blind in 2000, he needed assistance to maintain the property, and allowed friends and acquaintances to live there. (G. Zaskey Dep. 11:5-11.)[1] The evidence in this case reflects that Mr. Zaskey allowed others to stay at the property. Sometimes they paid Mr. Zaskey what they could afford, and "[t]here were people occupying the property. They weren't necessarily paying rent." (G. Zaskey Dep. 11:10-11.)

---

[1] Mr. Zaskey testified that from 2006-2012, a young woman, who was a friend of Mr. Zaskey's daughter stayed at the property and paid no rent. Mr. Zaskey also testified that during this time another "gentleman and his wife and a little child" stayed there, and also paid no rent. (G. Zaskey Dep. p. 23-25.) Mr. Zaskey testified: "My daughter lives there (in Palm Beach County), so she knew some people that could help me out by taking care of the property to keep it occupied so it didn't get destroyed." (G. Zaskey Dep. 25:18-22.)

In 2006, Mr. Zaskey obtained the subject loan. He used the proceeds to pay off various liens on the property (a result of his previous divorce). He also cashed-out some equity to purchase a home in Wisconsin. (G. Zaskey Dep. p. 16.)

In this case, no evidence shows that Mr. Zaskey used the property for commercial purposes, or did he ever market the property for rent. Mr. Zaskey never used the property to derive rental income. In fact, Mr. Zaskeys' testimony reveals the opposite, that due to his disability he needed help maintaining the property. He allowed family and friends to reside there in exchange for such help. This is also confirmed by Bank of America's own loan documents, which has a Second Home Rider attached to the Mortgage. (D.E. 142-2, p. 15 of 36.) This document clearly demonstrates that at the outset of the loan, this was not a contemplated rental property.

In addition, the summary judgment record demonstrates that the subject loan was *not* for commercial purposes, but was primarily for Mr. Zaskey's "personal, family or household" purposes. Additional proceeds derived from the refinancing of the property were used to pay off liens placed on the property associated with his divorce (a clear personal, family or household purpose), some credit card debt, and the rest as a down payment to purchase a residence in Wisconsin.[2] Thus, Bank of America is not entitled to summary judgment on this issue.

The case Green Tree relies upon, *Zwicky v. Carlson & Assocs.,* Case No. 11-1413, 2011 U.S. Dist. LEXIS 143206 (D. Minn. Dec. 13, 2011), is inapposite, and actually supports the Zaskeys' argument. In *Zwicky*, the court noted that "[t]he relevant time for determining the nature of the debt is when the debt first arises." *Id*. at *3 (citing *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, L.L.C.,* 214 F.3d 872, 874 (7th Cir. 2000)). In *Zwicky*, the underlying debt

_____

[2] During his deposition, Mr. Zaskey testified that from the loan amount of $78,000, the sum of $28,020.73 was used to pay off existing liens and credit card accounts, and the sum of $43,352.29 was used to purchase a home in Wisconsin. (G. Zaskey Dep. p. 18-21.)

was for plumbing services that were needed to repair the debtor's condominium - after the debtor converted his condominium to rental property. *Id*. at *4-5. In that case, the court found the plaintiff could not maintain an FDCPA claim, since the debt was incurred to repair the debtor's rental property. *Id*. at *4-5. The facts in *Zwicky* are far removed from the facts in this case.

In *Miller,* the plaintiff bought a house in Atlanta in 1992, and took out a mortgage. He lived in the house until 1995, when he accepted a job in Chicago; from then on, he rented the house. He received the dunning letter from one of the defendant law firms on behalf of the mortgagee years later, in 1997. *Miller*, 214 F.3d at 874. By this time, and after renting the property to strangers the court noted that the plaintiff was making a "business use" of the property. *Id*. Nevertheless, the court found that the debtor could state a claim under the FDCPA, since the debt was originally incurred for non-commercial purposes. *Id*. at 875. See also *Smith v. Atl. Springs Condo. Ass'n,,* No. 0:15-cv-61155-KMM, 2015 U.S. Dist. LEXIS 157830, *6 (S.D. Fla. Nov. 23, 2015) (noting that "[i]n determining whether an obligation is a debt under the FDCPA, a court's initial focus is upon the nature of the transaction from which the debt arose," and that the court should "look to both the primary transaction and any derivative obligations, like condominium association and homeowner's fees.") In light of this case law, and based on the unrefuted testimony of Mr. Zaskey himself, Green Tree is not entitled to summary judgment on this issue.

Second, Green Tree's argument that this claim is barred by the FDCPA's one-year statute of limitations also fails. (D.E. 209, p. 11.) Green Tree's argument that the one-year statute tracks backward from June 15, 2015 (when the Zaskeys obtained an order granting leave to amend) - is contrary to applicable law[3]. The Zaskeys' pleading that joined Green Tree as a party was attached

---

[3] See *Pompey v. Lumpkin*, 321 F. Supp. 2d 1254, 1258 n.2 (M.D. Ala. 2004) ("For statute of limitations purposes, an amended complaint is deemed filed on the date that the party files a motion for leave to file the amended complaint, rather than on the date that the motion for leave to amend

to a motion for leave to amend that was filed on December 6, 2014. (D.E. 1, page 2 of 78, ¶3.) The statute of limitations was tolled as of that date.

Third, Green Tree is not entitled to summary judgment on the Zaskeys' claim arising under 15 U.S.C. §1692(f)(1). Green Tree argues it did not violate Section 1692(f)(1) because it only attempted to collect amounts authorized under the note and mortgage. (D.E. 209, p. 12.) As the Zaskeys argued at length in their response to Bank of America's motion for summary judgment[4], this is based on a flawed interpretation of the Cooperative Short Sale Agreement (CSSA).

Here, the CSSA contains seventeen (17) terms and conditions, set forth in consecutively numbered paragraphs. (See G. Zaskey Dep., Ex. 10.) Paragraph Five of the CSSA states that the bank's short-sale approval "is void" if the closing does not occur by April 30, 2012 (G. Zaskey Dep., Ex. 10, ¶5). However, the CSSA does not contain a similar "void" provision concerning the receipt of the sales proceeds. The provision dealing with receipt of funds (Paragraph 14) only states that "payoff funds must be received within 48 hours ..." (G. Zaskey Dep., Ex. 10, ¶14.)

Here, it is undisputed the closing took place on April 26, 2012, within any conceivable deadline set forth in the CSSA. Therefore, the CSSA was not automatically voided. If Bank of America wanted the CSSA to automatically void where the proceeds were not received within 48 hours, it could have easily added "time is of the essence" language to Paragraph 14. The CSSA on

---

is granted, or the date that the amended complaint is docketed as a separate document."); *Broomes v. Schmidt*, 1996 U.S. Dist. LEXIS 5957, 1996 WL 229369, *1 (E.D. Pa. May 3, 1996) ("In both federal question and diversity cases, federal courts have looked to the time of the filing of a motion to amend a complaint for statute of limitations purposes.") (citing *Mayes v. AT & T Information Systems,* 867 F.2d 1172, 1173 (8th Cir. 1989).

[4] See the Zaskeys' full discussion on this issue, found in the Zaskeys' Response to Bank of America's motion for summary judgment (D.E. 244, p. 7-9), which the Zaskeys adopt and incorporate herein by reference.

its face provides that the failure to timely *close* would void the agreement, but the failure to timely wire funds did not. Florida law is clear. Absent an <u>express</u> stipulation that time is of the essence, a delay in performance will not void an otherwise valid agreement[5]. Here, there is no such express stipulation in the CSSA.

Since it was Bank of America, and not the Zaskeys, who materially breached the CSSA, Green Tree's debt collection efforts were unauthorized, and therefore in violation of the FDCPA. Bank of America had no legal right to reject the August 9, 2012 wire transfer from Harbor Title, and neither Bank of America nor Green Tree were authorized to pursue collection of any sums from the Zaskeys, since the Zaskeys fully performed under the CSSA.

Green Tree's statute of limitations argument on this Section 1692(f)(1) claim likewise fails. (D.E. 209, p. 12.) Green Tree again incorrectly uses the date the third-party complaint against Green Tree was approved by the court and docketed (June 15, 2015), rather than the date the Zaskeys filed their Motion for Leave to Amend and proposed pleading (December 5, 2014). See *Pompey,* 321 F. Supp. 2d at 1258.

Green Tree also argues that summary judgment is proper, because all communications made by Green Tree after December 6, 2013 "were not made by Green Tree in connection with

---

[5] See *National Exhibition Co. v. Ball*, 139 So. 2d 489, 492 (Fla. 2d DCA 1962) ("the modern trend of decisions concerning brief delays by one party in performance of a contract or conditions thereunder, in the absence of an express stipulation in the contract that time is of the essence, is to not treat such delays as a failure of a constructive condition discharging the other party unless performance on time was clearly an essential and vital part of the bargain."); *Jackson v. Holmes,* 307 So. 2d 470, 472 (Fla. 2d DCA 1975) (refusing to apply a "time is of the essence" clause contained within a paragraph concerning the ultimate closing to a different provision concerning bank loan certification); *Command Sec. Corp. v. Moffa*, 84 So. 3d 1097, 1101 (Fla. 4th DCA 2012)("Even if a contract contains a specified date for performance, when the contract does not specify that time is of the essence, a delay will not necessarily invalidate the provision.*"); Royal Dev. & Mgmt. Corp. v. Guardian 50/50 Fund V, Ltd.*, 583 So. 2d 403 (Fla. 3d DCA 1991)(strictly construing a time is the of the essence provision, such that the provision did not apply to every obligation under the contract.)

the collection of a debt." (D.E. 209, p. 12-13.) Green Tree argues it did not make any telephone calls to the Zaskeys after December 6, 2013, and none of the correspondence sent to the Zaskeys concerned debt collection. (D.E. 209, p. 13.)

These arguments fail for several reasons. As an initial matter, Green Tree has failed to produce a complete set of records of the telephone calls Green Tree and its agents made to the Zaskeys, which is the subject of a pending motion to compel filed by the Zaskeys (D.E. 242.) While Green Tree asserts it only made seven telephone calls to the Zaskeys, and that none of those calls occurred after December 6, 2013, such a position is based on an incomplete summary judgment record, a record that is incomplete due to Green Tree's own failure to produce discovery.

Green Tree's position is also contradicted by the evidence thus far obtained by the Zaskeys. For instance, on February 15, February 17 and February 24, 2014, Green Tree sent the Zaskeys Notices of Default letters, which demanded payment of $44,487.03 to cure the default, and threatened to file suit for foreclosure and use "all of our remedies provided by law…" (See Decl. of G. Zaskey, D.E. 204, ¶26, and D.E. 142-3, p. 29, 31, and D.E. 198-2, p. 84) Green Tree's position that it did not send any communications concerning debt collection after December 6, 2013 is completely unfounded[6].

In its motion, Green Tree argues these post December 6, 2013 letters cannot be debt collection efforts, because Green Tree included a disclaimer at the top of the letters stating that if the debtor filed for bankruptcy, "this communication is not intended as an attempt to collect a debt." (D.E. 209, p.13.) Green Tree's argument on this issue is nonsensical. Green Tree itself moved for relief from the automatic bankruptcy stay, which it obtained in February 13, 2014. By

---

[6] Green Tree also sent a September 2, 2014 letter (D.E. 198-03, p. 24), which claimed that the Zaskeys current payoff was $142,796.28, and that the Zaskeys agreed to make voluntary payments of this amount to remain in their home (which they no longer even owned or lived in.)

the time Green Tree sent the February 2014 letters, Green Tree knew a bankruptcy stay did not apply to Green Tree's collection efforts, and its "disclaimer" had no application to the Zaskeys' account. Green Tree's February 2014 disclaimer notes that in the case of a discharge, it is not attempting to collect a debt because "[y]ou therefore have no personal obligation to pay on this account." (D.E. 142-3, p. 29.)  Since Green Tree undoubtedly knew the Zaskey debt obligation was not discharged as a result of the bankruptcy, its argument on this issue is unfounded and should be rejected by the Court[7].

Green Tree is also liable under Section 1692(f)(1) for the February 15, February 24, March 3, March 10, August 15, August 28 and August 29, 2014 letters it sent the Zaskeys. (Decl. of G. Zaskey, D.E. 204, ¶26, D.E. 198-2, p. 73, 84, 90, 94, 98,101, 104, 109; D.E. 198-3, p. 13, 17, 21.) While Green Tree previously argued these were mere "loss mitigation" letters – and were not debt collection efforts – Green Tree sent these letters *years* after the short-sale closing took place. Without any request from the Zaskeys, Green Tree unilaterally completed loss mitigation applications on behalf of the Zaskeys, and then approved the Zaskeys for a short-sale or other loss mitigation options on a property the Zaskeys already sold via a short sale. (D.E 198-2, p. 101, 104, 109; D.E. 198-3, p. 13, 17.) The Zaskeys found these communications extremely disturbing and

---

[7] Not only is Green Tree's position factually inaccurate, but the case law Green Tree cites in support of this theory, *Helman v. Udren Law Offices, P.C.,* 85 F. Supp. 3d 1319 (S.D. Fla. 2014), is inapplicable. There, this Court cited to *Gburek v. Litton Loan Servicing L.P,* 614 F.3d 380 (7th Cir. 2010), which involves facts much closer aligned to the facts in this case. In *Gburek,* like this case, the loss mitigation letter (which was deemed to be a debt collection activity) requested that the debtor complete and return an enclosed form, and provide the requested documentation, and set an arbitrary deadline for responding. *Id.* at 1326-27. Here, Green Tree sent similar correspondence to the letters sent in *Gburek,* and *Gburek* rather than *Helman,* should control. (D.E. 198-2, p. 109-111 and D.E. 198-3, p. 4-11.)

frustrating, since they never requested or applied for any such loss mitigation programs, and had closed on a short sale about two years earlier. (Decl. of G. Zaskey, D.E. 204, ¶27-28.)

These letters were not good faith offers to settle or modify the loan[8]. Instead, they are misleading, false and deceptive from the viewpoint of the "least sophisticated consumer" - and they are indicative of the repeated instances where Green Tree and Bank of America ignored the Zaskeys' pleas to investigate the April 2012 short sale closing. These "loss mitigation" letters also threatened foreclosure if they were not accepted, despite the fact that Bank of America already had a baseless foreclosure action pending. (D.E. 198-2, p. 109; D.E. 198-3, p. 13.) Simply put, these were not good faith offers of "loss mitigation" or settlement, and they are properly classified as debt collection activities. See *Goswami v. Am. Collections Enter*., 377 F.3d 488, 496 (5th Cir. 2004) (plaintiff had actionable FDCPA based on letter offering settlement to debtor, where the Fifth Circuit noted "[w]hile we agree that it is important to permit collection agencies to offer settlements, that policy consideration does not remove collection agencies' obligation under the FDCPA to deal in a nondeceitful manner. A collection agency may offer a settlement; however, it may not be deceitful in the presentation of that settlement offer."); *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 385 (7th Cir. 2010) ("a communication need not make an explicit demand for payment in order to fall within the FDCPA's scope; rather, [ ] a communication made specifically to induce the debtor to settle her debt will be sufficient to trigger the protections of the FDCPA.")

---

[8] In fact, the "relief" offered in those loss mitigation letters is completely illusory. The Zaskeys already sold the property, so they could not participate in a subsequent short-sale or deed in lieu of foreclosure without committing fraud. Similarly, the Zaskeys could not modify their prior mortgage under any government loan modification program. Once the April 2012 short sale closing took place, the Zaskeys no longer owned the mortgaged property. Further, Harbor Title had already sent payment via wire transfer to Bank of America and attempted to send payment to Green Tree, in full satisfaction of the debt, which both entities unlawfully rejected.

Fourth, Green Tree argues summary judgment is proper on the Zaskeys' claim under Section 1692d of the FDCPA, because the loan had not been satisfied at the time Green Tree attempted to collect the debt. Green Tree also argues that "the April 2012 sale of the Mortgaged Property was not authorized, and BOA did not give its final approval for the closing of the short sale as was required under the March 2012 Short Sale Approval Letter.[9]" (D.E. 209, p. 14.)

This argument fails, as the only reason the loan remained unsatisfied is because Bank of America unlawfully rejected the short sale proceeds sent by wire transfer on August 9, 2012. When Bank of America received the short sale proceeds, the loan was repaid as agreed and was no longer in default. When Bank of America rejected these proceeds on August 16, 2012 and sent the $26,788.44 back to Harbor Title, Bank of America was in breach of the CSSA. Green Tree and Bank of America cannot now claim that the loan had not been repaid, when Bank of America had in its possession the very proceeds it and Fannie Mae agreed to receive in satisfaction of the loan, and which proceeds ultimately satisfied the loan[10].

Fifth, Green Tree argues for summary judgment on the Zaskeys' Section 1692e claim. (D.E. 209, p. 14.) Green Tree's argument that it cannot be liable under the FDCPA, because the

---

[9] The idea that the April 26, 2012 closing was not "authorized" by Bank of America is completely unfounded. Since time was not of the essence with regard to the forwarding of the short sale proceeds, and since Bank of America is clearly liable for the breach of the CSSA (as argued previously herein), Green Tree offers this strained interpretation of the CSSA in a bid to avoid liability for its subsequent debt collection efforts. Not only is there no evidence to support the idea that the April 26, 2012 closing and sale was unauthorized, but it is telling that Bank of America itself does not offer this interpretation of the underlying CSSA.

[10] See *Mori v. Matsushita Elec. Corp. of Am.,* 380 So. 2d 461, 464 (Fla. 3d DCA 1980), citing *Sullivan v. McMillan*, 26 Fla. 543, 8 So. 450 (1890)(". . . where the contract is being performed, and one of the parties notifies the other unequivocally that he will not perform or further perform his part, or will not accept performance by the other, the latter may treat the contract as put to an end or entirely broken by the former, and, if ready and willing to perform his part, sue him at once for an entire breach of contract . . .")

loan had not been satisfied, is completely without merit. As noted above, the *only* reason the loan was not fully satisfied is because Bank of America unlawfully rejected the August 9, 2012 wire transfer, and thus breached the CSSA.

## IV.   GREEN TREE IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE ZASKEYS' FCCPA CLAIM.

Green Tree next argues it is entitled to summary judgment on the Zaskeys' FCCPA claim (D.E. 209, p. 9.)  For ease of reference, the Zaskeys' respond to each argument in the same format utilized by Green Tree.

First, Green Tree's argument that the FCCPA does not apply because the underlying loan was not for personal, family or household purposes fails for the same reason it failed under the above FDCPA analysis. The FCCPA defines a consumer debt as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are **primarily** for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." Fla. Stat. §559.55(6) (emphasis added.)

As noted above, the record demonstrates the subject loan was *not* for commercial purposes, but was instead primarily for Mr. Zaskey's "personal, family or household" purposes - namely, as a second home. Moreover, the additional proceeds derived from the refinancing were used to pay off prior liens on the property, and as a down payment to purchase a home in Wisconsin.

Second, Green Tree's statute of limitations argument fails, for the same reasons set forth above. The statute of limitations does not bar claims that are based on collection efforts made by Green Tree prior to June 15, 2013. The Zaskeys' motion for leave to amend and proposed amended pleading that joined Green Tree in this action was filed on December 5, 2014. Thus, all violations by Green Tree that occurred two years prior to December 5, 2012 are actionable in this case.

Third, Green Tree is not entitled to summary judgment on the Zaskeys' Section 559.72(7) claim. Green Tree's assertion that it made only seven calls over seven months is based on an incomplete summary judgment record. As mentioned above, Green Tree has failed to produce a complete set of records of the telephone calls Green Tree and its agents made to the Zaskeys, which is the subject of a pending motion to compel filed by the Zaskeys (D.E. 242.)

Further, considering the numerous letters sent to the Zaskeys, the evidence demonstrates Green Tree engaged in substantially more than just seven (7) debt collection communications intended to annoy, abuse and harass the Zaskeys. When analyzing the related provision of the FDCPA (Section 1692d), courts consider both the volume and the pattern of communications with the debtor. *Martin v. Select Portfolio Serving Holding Corp.*, 2008 WL 618788, *6 (S.D. Ohio Mar. 3, 2008) ("In determining whether the debt collector intended to annoy, abuse and harass the consumer, the Court may consider frequency, persistence, and volume of the telephone calls."); *Rutyna v. Collection Accounts Terminal, Inc.,* 478 F. Supp. 980 (N.D. Ill. 1979) (entering summary judgment for plaintiff, and finding that a single threatening letter can create liability under Section 1692d); *Henderson v. Credit Bureau of Lockport,* 1989 U.S. Dist. LEXIS 19138 (W.D.N.Y. July 13, 1989)(noting that "courts have discretion to proscribe harassing conduct that is not specifically addressed by section 1692d", and finding that handwritten language by debt collector on a single 48-hour notice was harassing.)

Like *Rutyna* and *Henderson* above, here, the frequency and circumstances of Green Tree's communications to the Zaskeys show that Green Tree intended to annoy, abuse and harass the Zaskeys. This is not a case where a debt collector made repeated unsuccessful efforts to reach a consumer. Nor is this a case where a debt collector had a good faith belief that the debt was legitimate. Here, Mr. Zaskey repeatedly told Green Tree representatives that a prior short sale

closed, and the debt no longer owed. (Decl of G. Zaskey, ¶21-25.) Green Tree ignored this information. In light of its conduct, Green Tree is not entitled to summary judgment on this claim.

Fourth, Green Tree argues the correspondence it sent the Zaskeys was not sent "in connection with the collection of a debt." This is unsupported by the record, which reveals numerous written communications in which Green Tree clearly attempted to collect a debt. These include the February 15, February 17, February 24, March 3, March 10, August 15, August 28 and August 29, 2014 letters sent the Zaskeys. (Decl. of G. Zaskey, D.E. 204, ¶26, D.E. 198-2, p. 73, 84, 90, 94, 98,101, 104, 109; D.E. 198-3, p. 13, 17, 21; D.E. 142-3, p. 29 and 31); see also *Gburek v. Litton Loan Servicing LP*, 614 F.3d at 386 (7th Cir. 2010)(mortgagor's letter telling the homeowner that she could avoid foreclosure if she submitted certain financial information was sufficient to bring her claim within the scope of the FDCPA, where homeowner was in default on her loan, and the letter offered to discuss "foreclosure alternatives" and asked her for financial information in order to initiate that process.)

Fifth, Green Tree is not entitled to summary judgment on the Zaskeys' Section 559.72(9) claim. (D.E. 209, p. 17-18.) Green Tree' argument that it "did not know that the debt at issue was not legitimate nor that it did not have the legal right to pursue a foreclosure action against Plaintiffs" is contradicted by the evidence in this case.

The record demonstrates that Green Tree had actual knowledge this right to collect did not exist. Most notably, this actual knowledge stems from Mr. Zaskey's numerous communications with Green Tree representatives, when he told Green Tree representatives that he completed an approved short sale, and that a closing already occurred. (Decl of G. Zaskey, ¶22.)

Additional evidence of actual knowledge is Mr. Zaskey's written correspondence to Green Tree, which includes two qualified written requests (QWRs). Mr. Zaskey's QWRs, in which he

told Green Tree, and then specifically his "assigned account representative" named "Mario P.", stated that a Bank of America approved short sale was concluded in April of 2012, and that "I owe nothing on this loan." (Decl of G. Zaskey, ¶24-25, and D.E. 142-4, p. 2-6.)

Sixth, the Zaskeys' FCCPA claim under Section 559.72(3) is not preempted by the Fair Credit Reporting Act (FCRA). In this case, the Zaskeys maintain that Green Tree and Bank of America violated Section 559.72(3) by failing to advise the Zaskeys that Green Tree would disclose the disputed nature of the debt when making such a disclosure to third-parties. Zaskeys' claim here arises under a statutory duty owed by Green Tree, and encompasses not just Green Tree's reporting to various credit bureaus, but Green Tree's disclosure of the debt to any third party. Subsection (3) is not preempted by the FCRA, because it does not depend on Green Tree's actual reporting of the debt to credit bureaus under the FCRA.

Green Tree had an independent obligation to tell the Zaskeys that any reports Green Tree issued would reflect the disputed nature of the debt, regardless to whom those reports were issued. Whether Green Tree ever reported the debt to credit reporting agencies or not is immaterial to whether Green Tree violated that duty. Since this claim does not concern the actual act of credit reporting, but instead concerns a mandatory disclosure that Green Tree was required to make to the Zaskeys, the claim is actionable and is not preempted by the FCRA. See *Osborne v. Vericrest Fin., Inc.,* No. 8:11-cv-716-T-30TBM, 2011 U.S. Dist. LEXIS 52787, *6-7 (M.D. Fla. May 17, 2011) (Plaintiffs' FCCPA claim is partially preempted by the FCRA **to the extent that it alleges disclosure of false information to credit reporting agencies**.)  This §559.72(3) claim does not involve the disclosure of false information to credit reporting agencies, and Green Tree is therefore not entitled to summary judgment.

## V.   GREEN TREE IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE ZASKEYS' RESPA CLAIM.

First, Green Tree's argument that the RESPA claim fails because the property was for business, commercial or agriculture purposes fails for the same reasons stated above. The summary judgment record demonstrates the subject loan was *not* for commercial purposes, but was instead primarily for Mr. Zaskey's "personal, family or household" purposes - namely, as a second home. Moreover, The Zaskeys used the additional proceeds derived from the refinancing to pay off prior liens on the property, and as a down payment to purchase a home in Wisconsin.

Second, Green Tree's argument that the Zaskeys' did not send valid QWRs, because they were not sent to Green Tree's "separate and exclusive address", likewise fails. (See D.E. 209, p. 19-20.) On this issue, Green Tree argues on May 3, 2013, it sent the Zaskeys notice of a specific address for mailing QWRs, pursuant to 24 C.F.R. § 3500.21(e)(1). Green Tree argues Mr. Zaskeys' letters are not valid QWRs, because he mailed them to Green Tree at PO Box 6172 Rapid City, SD 57709-6172, rather than PO Box 6176, Rapid City, SD 57709-6176. (D.E. 209, p. 20.)

The Zaskeys mailed the first QWR within a day of receiving the initial May 1, 2013 letter from Green Tree. (See Decl. of G. Zaskey, D.E. 204, ¶243 and D.E. 142-4, p. 2-3.) This QWR was sent before Green Tree's subsequent May 3, 2013 letter which designated a special address for receiving QWRs. Green Tree's later disclosure of a designated address does not invalidate Mr. Zaskey's prior QWR, which was sent to the only address Green Tree provided as of that date.  See *McClain v. CitiMortgage*, 2016 U.S. Dist. Lexis 7523, *17 (N.D. Ill. January 21, 2016) (rejecting a similar argument to the one Green Tree makes here, and noting that "Citi has quite understandably pointed to no authority to support the mind-boggling notion that the designation of an exclusive address could possibly be retroactive in effect.")

The Zaskeys' second QWR, mailed on or about May 8, 2013, is also a proper QWR. (See D.E. 142-4, p. 5-6.) Even a cursory review of Green Tree's May 3, 2013 letter - which designated

a specific QWR address - reveals that the letter is purposely designed to mislead the consumer and fails to comply with 24 C.F.R. § 3500.21(e)(1). (D.E. 198-2, p. 37-40.)

The subject May 3, 2013 letter, on page one, welcomes the borrower to Green Tree and notes that "[t]his communication is from a debt collector. It is an attempt to collect a debt, and any information obtained will be used for that purpose." (D.E. 198-2, p. 37.) **Over the next four pages, the letter provides eleven (11) mailing addresses** by which the borrower can contact Green Tree. On page one, the letter tells the borrower to contact Green Tree at PO Box 6172, Rapid City, SD 57709-6172, "should you ever need additional account information." (Id.).

On page two, the letter provides a post-office box address in Pasadena, California to send payments, and later lists the same address for "bill payment services." Page two of the letter lists another post office box, located in Miami, Florida, for "Insurance Loss Payee Information." The sixth (6th) address listed on page two is for "Customer Service" - and identifies PO Box 6172 as the proper address (the same post office box in Rapid City, identified on page one of the letter.)

Page three of the letter lists an additional two addresses, and includes a post-office box address in Pasadena, California for sending all payments "due on or after May 1, 2013." (D.E. 198-2, p.39.) At the bottom of this page, and after identifying some ten (10) other addresses to the borrower, Green Tree lists its address for QWRs as "PO Box 6176, Rapid City, SD 57709-6176." (Id.)

Notably, Green Tree's address for account inquiries and the address for QWRs are nearly identical. One address is at post office box 6172, and the other at post office box 6176. This is no accident. The letter is designed to mislead borrowers and avoid any potential liability under RESPA. The May 3, 2013 letter also fails to comply with 24 C.F.R. § 3500.21(e)(1).

As noted by the court in *Catalan v. RBC Mortgage Co.*, Case No: 05-C-6920, 2008 U.S. Dist. Lexis 52065 (N.D. Ill. July 8, 2008), the option of establishing a "separate and exclusive address" provides a powerful tool for servicers, for noncompliance by the customer can bar an otherwise potentially meritorious RESPA claim. *Id*. at *22. The court also noted that "[b]ecause RESPA is a consumer protection statute . . . this Court must presume that HUD, in implementing the will of Congress, included the 'separately delivered' requirement to ensure that borrowers would not be blindsided by notices of separate and exclusive addresses buried in the fine print of complex documents or conveyed subtly in communications from mortgage servicers." *Id*. at *22-23.

In *Catalan,* the court found the servicer failed to comply with 24 C.F.R. § 3500.21(e)(1), because the regulation requires that such a designated address either be provided in the initial notice of transfer, or in a separate document that contained only such information concerning RESPA and QWRs. See *Catalan* at *23 ("While neither Congress nor HUD specified any particular language for the notice, HUD did specifically require that the notice be conveyed in a separate document. **The Court reads the regulation as mandating that a proper notice include only information concerning the designated "separate and exclusive address" and its purpose**.")

Here, not only was Green Tree's notice intentionally misleading, but it fails to comply with both the spirit and letter of 24 C.F.R. § 3500.21(e)(1). Since both of the Zaskeys' QWRs are valid, Green Tree is not entitled to summary judgment on this issue.

**WHEREFORE**, in view of the foregoing, the Counter-Plaintiffs request this Court enter an order denying Green Tree's Motion for Summary Judgment, and that the Court grant any further relief this Court deems just and proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via U.S. Mail and/or E-mail and/or CM/ECF on this the 1st day of August, 2016 to: Liebler, Gonzalez & Portuondo, Attorneys for Bank of America, N.A., Courthouse Tower, 25th Floor, 44 West Flagler Street, Miami, FL 33130, service@lgplaw.com; bg@lgplaw.com; sqr@lgplaw.com; akg@lgplaw.com; mkv@lgplaw.com; Shutts & Bowen, LLP, JBustard@shutts.com; Harbour Land Title, LLC, c/o Zahera Sadik, 11301 Okeechobee Blvd, Suite 1A, Royal Palm Beach, FL 33411, VIA EMAIL: zee@harborlandtitle.com; Cohen, Norris, Wolmer, Ray, Telepman & Cohen, VIA EMAIL: jst@fcohenlaw.com

Respectfully Submitted,

Law Offices of Daryl L. Jones, P.A.
14707 South Dixie Hwy., Ste 101
Miami, FL 33176
Tel: 888-328-5942
djones@DLJonesLaw.com
fkhan@DLJonesLaw.com
eromanowski@DLJonesLaw.com

By: */s/ Daryl L. Jones, Esq.*_____
  ■ Daryl L. Jones, Esq./FBN.: 742589
  ☐ Faequa A. Khan, Esq./FBN.: 100278