**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

BANK OF AMERICA, N.A. Successor by            CASE NO:   15-cv-81325
Merger to BAC HOME LOANS
SERVICING LP, f/k/a COUNTRYWIDE
HOME LOANS SERVICING

        Plaintiff,

vs.

GARY L. ZASKEY a/k/a Gary Lynn Zaskey;
LORI A. ZASKEY a/k/a Lori Ann Zaskey;
BRENDA LYNN ZASKEY; UNKNOWN SPOUSE
OF BRENDA LYNN ZASKEY; et al.

        Defendants.
_____/

GARY L. ZASKEY and LORI A. ZASKEY

        Counter-Plaintiffs

vs.

BANK OF AMERICA, N.A.,
GREEN TREE SERVICING, LLC, HARBOR LAND TITLE, L.C.
and OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPANY

        Counter-Defendants
_____/

## COUNTER-PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

        Defendants/Counter-Plaintiffs, GARY L. ZASKEY and LORI A. ZASKEY, (hereinafter "the Zaskeys") by and through their undersigned attorney, hereby file this Reply Brief in Support of their Motion for Summary Judgment (D.E. 237), and in reply to the Response Briefs filed by Bank of America (D.E. 253) and Green Tree (D.E. 254), and state as follows:

## ARGUMENT IN REPLY

**A.  BREACH OF CONTRACT AGAINST BANK OF AMERICA**

> **i.      Bank of America and Green Tree's interpretation of the contract is flawed.**

In their Response Briefs, Bank of America and Green Tree argue that under the Cooperative Short Sale Agreement, time was of the essence, given the nature of the contract. (See, e.g., D.E. 253, p. 13; D.E. 254, p. 3-6.) In support of that argument, Counter-Defendants cite to *Treasure Coast, Inc. v. Ludlum Constr. Co.*, 760 So. 2d 232, 234-35 (Fla. 4th DCA 2000), where the Fourth DCA found time to be of the essence for the parties' settlement agreement based on the nature of the terms even though there was not an express recital specifically stating "time is of the essence." While Bank of America argues that *Treasure Coast* supports its interpretation of the CSSA, the language that Bank of America omits from its Response makes it clear that Treasure Coast actually supports the Zaskeys' interpretation, and the Treasure Coast opinion is consistent with the numerous cases the Zaskeys cited in their Motion for Summary Judgment.

In *Treasure Coast*, the payment language of the contract stated: "If payment is more than ten days late then the Plaintiff will be entitled to a judgment upon Affidavit against the Defendant for $ 65,000.00 less payments made." *Id*. at 234.  While the court in Treasure Coast held that time was of the essence - even though that particular phrase was not used in the agreement - the court reached that conclusion because "[i]n providing appellant with a specific remedy, judgment for the entire amount due and owing in the event of nonpayment, the parties essentially agreed that time was of the essence." *Id.* In other words, time was of the essence, because the specific payment provision of the contract notified the parties that if payment was not received by a date certain, a specific remedy or penalty would be assessed against the party that failed to pay.

With respect to the April 30, 2012 closing deadline found in Paragraph 5 of the CSSA, Bank of America used similar language, and provided that the bank's short-sale approval "is void" if the closing did not occur by that date. Time was clearly of the essence with respect to that provision. However, Bank of America did not use that type of language when setting forth the deadline for transmitting the sales proceeds, which are contained in paragraph 14 of the CSSA. In paragraph 14, Bank of America *did not* state that its approval "is void" - nor does that provision contain any specific warning or remedy as to what will occur if payment is not immediately received. Simply put, not only does *Treasure Coast* **not advance** Counter-Defendants' argument,

but it actually supports the Zaskeys' argument that the proper interpretation of the CSSA is that time <u>was not</u> of the essence with respect to the 48-hour payment provision found in Paragraph 14.

Bank of America's case of *Sublime, Inc. v. Boardman's Inc*., 849 So. 2d 470 (Fla. 4th DCA 2003) contains the same distinguishing characteristic. There, the court found that time was of the essence, because "although there was no provision expressly stating that time was of the essence, any delay in payment was sheltered by a built in five day grace period and the agreement clearly specified that upon default, the stated amount would be 'immediately' due and payable. This was sufficient to put Boardman's on notice that failure to pay at the allotted time would result in a default and trigger the acceleration provision." *Id*. at 471. See also, Green Tree's case of *Polezoes v. Bartlett*, 921 So. 2d 35, 35-37 (Fla. 4th DCA 2006) (*citing Treasure Coast, Inc. v. Ludlum Construction Co.*, 760 So.2d 232 (Fla 4th DCA 2000)(involving a settlement agreement that provided "[i]f through no fault of appellee the sale failed to occur within the 30 days, then appellants were required to execute and deliver to appellee a quitclaim deed to the property and dismiss their claim.")[1] These cases also involved provisions that contained a specific penalty that would occur if payment was not made by the due date. They are simply not controlling in this case.

The Counter-Defendants' case law is inapplicable because in this case, the CSSA contains no warning similar to that found in *Treasure Coast* and *Sublime.* Here, Paragraph Five of the CSSA states that the bank's short-sale approval "is void" if the closing does not occur by April 30, 2012. This provision is consistent with *Treasure Coast* and *Sublime.* It is undisputed that the closing occurred before April 30, 2012. However, the CSSA does <u>not</u> contain a similar "void" provision or any similar warning in addressing the receipt of the sales proceeds. (G. Zaskey Dep., Ex. 10, ¶14.)[2]

---

[1] It is telling that the cases Counter-Defendants rely on all involve the interpretation of settlement agreements, where the agreement specifically provided that if payment was not timely made by a date certain, certain penalties would immediately result. In contrast, those cases involving the interpretation of real estate contracts recognize that real estate closings involving a lot of "moving parts", and often involve unavoidable delays. See, e.g. *Command Sec. Corp. v. Moffa*, 84 So. 3d 1097, 1101 (Fla. 4th DCA 2012)("Even if a contract contains a specified date for performance, when the contract does not specify that time is of the essence, a delay will not necessarily invalidate the provision.*")

[2] If time was of the essence, then Bank of America would not have extended the first CSSA from December 21, 2011. (D.E. 182-2, p. 5-7 of 40.) Simply because the buyer wanted to lower the sale

Finally, Bank of America's argument that the Zaskeys' interpretation would somehow work an "injustice" against Bank of America is without any merit. (See D.E., p. 15-16.) It was Bank of America who drafted the CSSA. If Bank of America wanted the CSSA to automatically void if payment was not received within 48 hours, it could have easily added such language. Bank of America's claim that it suffered an "injustice" is also belied by the fact that Bank of America actually held the short sale proceeds for a week from August 9 to August 16, 2012 before returning them to the closing agent. (Sadik Dep. P. 30: 18-24.) Additionally, it is telling that despite years of harassment and abusive debt collection efforts by Bank of America, the owner of the loan, Fannie Mae, willingly accepted the exact amount of the third party buyers' short sale proceeds from the April 26, 2012 closing without charging any additional interest, in full satisfaction of the mortgage. (D.E. 142-1, p. 24 of 37.) Given these facts, any reasonable person would be hard pressed to find any "injustice" against Bank of America rather than against the Zaskeys.

### ii. The Relocation Assistance Letter Supports the Zaskeys' Interpretation of the CSSA.

In its Response, Bank of America argues that the Relocation Assistance letter did not amend the CSSA, and the fact that the Zaskeys received the full Relocation Assistance payment does not mean that Bank of America acknowledged the Zaskeys' performance under the CSSA. (D.E. 253, p. 16-17.)

The evidence in this case reflects that the Relocation Assistance letter was sent by Bank of America directly to the Zaskeys at their Wisconsin address. (G. Zaskey Dep. p. 83-85; Exhibit 11.) The March 16, 2012 CSSA, however, which was addressed to the subject property in Palm Beach County, was also sent by Bank of America to the closing agent, Harbor Title, which then forwarded the CSSA to the Zaskeys for signature. (G. Zaskey Dep. p. 7: 13-20, Exhibit 10.) Bank of America's argument that the Relocation Assistance letter did not create any ambiguities, because it was received *before* the CSSA, is without any merit. The evidence reflects that Bank of America sent important documents related to the short sale closing to different addresses. Further, Mr. Zaskey testified that the first time he saw the March 16, 2012 CSSA was when Harbor

---

price from $40,000.00 to $36,000.00, Bank of America extended by at least three months the date on which the transaction would become void if it did not close, thus significantly extending the date by which Bank of America would receive the short sale proceeds. (D.E. 142-2, p. 23-25 of 36.) Clearly, the time to receive funds was very flexible.

Title forwarded it to them shortly before the April 26th closing.  (G. Zaskey Dep. p. 7: 13-20.) The Zaskeys were in no position to determine whether one letter superseded the other, and the presence of conflicting closing deadlines created a clear ambiguity that must be construed against Bank of America.

Additionally, the Zaskeys do not argue that the Relocation Assistance letter changed the terms of the CSSA. Rather, the letter renders the closing date language of the CSSA ambiguous, which must be interpreted against the author of the CSSA.  Further, it was Bank of America that drafted the Relocation Assistance letter, which included language that the Zaskeys had until August 31, 2012 to close on the short sale. (D.E. 142-2, p. 26 of 36.) This language reconciles with the language in the third paragraph of the CSSA which states that the short sale must close "within the 120 day marketing period." (D.E. 142-2, p. 23-25 of 36.) While Bank of America now argues that the closing date language in the Relocation Assistance letter was not binding and was mere surplusage, such an argument does not negate the Zaskeys' position that the two letters are inherently ambiguous with respect to the closing deadline.

In its Response, Bank of America also argues that the Zaskeys' receipt of $5,000 in relocation assistance is not proof that the Zaskeys performed under the CSSA and that Bank of America acknowledged such performance. (D.E. 253, p. 17-18.) On this issue, Bank of America relies heavily on the Affidavit of Tiffany Barnfield, who reviewed Bank of America's business records with respect to the Zaskey loan. (D.E. 207-1, ¶3.) Ms. Barnfield states that after her review, there is no record that Bank of America received a certified copy of the final HUD-1 or that Harbor Title complied with the instructions Bank of America provided for uploading certain closing documents into Bank of America's short-sale system (D.E. 207-1, ¶26-33.)

Quite frankly, Bank of America's reliance on what is, or what is not, found in its own business records concerning the Zaskey loan should have limited persuasive appeal to this Court. Bank of America's record keeping in this case was substandard, and the summary judgment record is replete with examples of this inaccurate record keeping. For instance, in this case:

      a.   The Zaskeys never used the Palm Beach County address as their primary address as this was a second home, as evidenced by the Second Home Rider attached to the subject property's mortgage. (D.E. 142-2, p. 15 of 36.) The Zaskeys had already established Wisconsin as their permanent residence when this loan originated. Despite that, Bank of America sent the December 21, 2011 and March 16, 2012

CSSAs to the Palm Beach County address. (D.E. 182-2, p. 5-7 of 40 and D.E. 142-2, p. 23-25 of 36.) The Zaskeys never received the December CSSA until it was produced through discovery in this case. (G. Zaskey Dep. 78: 23-25 through 79:1-3.)

b.  Bank of America sent the March 16, 2012 CSSA to either the Re/Max Platinum realtor or directly to the closing agent despite language in the second paragraph of the CSSA stating, "You will need to forward a copy of this letter to your closing agent, because no additional statement will be issued." (D.E. 142-2, p. 23 of 36). This is evidenced by the fact that the first time the Zaskeys saw this CSSA was when they received it from the closing agent along with the rest of the closing documents. (G. Zaskey Dep. p. 7: 13-20.)

c.  On July 26, 2012, Bank of America sent a letter regarding a TPP loan modification to the Zaskeys' correct Wisconsin address. However, that letter asked the Zaskeys to accept a loan modification on a property they no longer owned. (G. Zaskey Dep. Exhibit 18.)

d.  Bank of America filed a foreclosure against the Zaskeys on September 26, 2012. A title search would have revealed that they no longer owned the property. Bank of America did not join the fee simple owners following the short sale, Bernardo Moreno, and Doralba Tellez Vargas - whom they noted in their March 16, 2012 CSSA at paragraph 6. (D.E. 142, p. 69 of 98.)

e.  On June 13, 2013, Bank of America sent the Zaskeys a letter regarding an escrow account on a property they no longer owned. (D.E. 142-3, p. 9 of 45.)

f.  Bank of America refused to voluntarily dismiss its foreclosure action for 9 months - even after receiving evidence that Green Tree recorded a Satisfaction of Mortgage, thus making the foreclosure a nullity. (D.E. 142-1, p. 24 of 37 and D.E. 142-2, p. 18 of 36.)

Additionally, Bank of America's argument that it did not approve of the relocation assistance payment (and thus recognize the Zaskeys' performance under the CSSA) is contradicted by its own evidence, namely the Equator system notes Bank of America produced in this case. In this case, there is clear evidence that Bank of America authorized the $5,000 relocation assistance payment. Here, paragraph 8.a. of the CSSA authorized the initial $2,500 payment to the Zaskeys, and the Equator notes - written by a Bank of America employee - authorized the additional $2,500 relocation assistance payment. (D.E. 182-2, p. 19 of 40, 3/10/2012 entry.)

Through their Response briefs, Bank of America and Green Tree also take the position that Harbor Title, as closing agent, was the Zaskeys' sole agent, and that Harbor Title's failure to properly conduct the closing is attributable to the Zaskeys. Notably, neither Counter-Defendant cites any law in support of that position. (D.E. 253, p.4 of 28 and D.E. 254, p.3 of 16.) This is because Harbor Title, as settlement / closing agent, was the agent and fiduciary **of all parties**. See *The Fla. Bar v. Joy,* 679 So. 2d 1165, 1167 (Fla.1996) (holding that a closing agent owes a fiduciary duty to all of the principal parties involved in the closing); *Sudberry v. Lowke,* 403 So. 2d 1117, 118-19 (Fla. 5th DCA 1981)(noting that the closing agent was the agent for the buyer.)

The Counter-Defendants' argument that the Zaskeys were responsible for complying with the closing instructions Bank of America sent Harbor Title is not only contrary to applicable law, but the notion runs contrary to how real estate closings are conducted, a fact which Bank of America is well aware. Bank of America can point to no circumstance in the history of short-sale closings were an individual seller is personally responsible and actually sent closing documents and payment to the lender in lieu of a closing agent that bore this responsibility. Historically, closing agents or realtors perform this function. The evidence obtained thus far shows that the closing agent sent out every check, and that the Zaskeys did not perform any of those functions. In addition, there is no evidence that the Zaskeys had access to (a user name or password, or for that matter any training to use) the Equator system to which Bank of America required the closing documents to be uploaded. (D.E. 142-2, p. 25 of 36, Item #2 of 4.)  Nor did Bank of America cite any evidence that it made the Equator system available to the Zaskeys, or that Bank of America actually contemplated the Zaskeys would upload the documents or wire the funds themselves. Bank of America's assertion is completely disingenuous.

While Bank of America and Green Tree argue that Harbor Title was the Zaskeys' sole agent, Bank of America's conduct actually reflects the opposite. Bank of America's own filing

notes that it repeatedly instructed Harbor Title on how to act, on what documents to submit and how to otherwise conduct the short-sale closing[3]. (D.E. 253, p. 18, Bank of America's Affidavit, D.E. 207-1, ¶28-31.) This is sufficient to establish with respect to the closing and submission of documents and payments, that Harbor Title was the agent of Bank of America, not the Zaskeys. See *Goldschmidt v. Holman,* 571 So. 2d 422, 424 n.5 (Fla. 1990) ("Essential to the existence of an actual agency relationship is (1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent.")

Moreover, Bank of America never contacted the Zaskeys and told them of any issues with the short-sale closing. In this case, Bank of America has not pointed to any evidence, such as a letter sent to the Zaskeys in Wisconsin, which advised the Zaskeys that the short-sale did not close, nor were there any communications to the Zaskeys that the CSSA was void.

In its Response, Green Tree also argues that BOA made time of the essence retroactively, by sending a "message to Plaintiffs' closing agent notifying the closing agent that "The Approval Letter has expired and no communication has been received. Please provide the status of this file **immediately** to avoid having the file declined. Thank you." (D.E. 254, p 6-7.) This argument fails because (1) Harbor Title was not the Zaskeys agent, as it was taking orders and instructions from Bank of America and is thus properly viewed as Bank of America's agent, and (2) there is a notable absence of any evidence reflecting communications from Bank of America to the *actual signatory to the underlying contract,* the Zaskeys, notifying the Zaskeys of any issue whatsoever with the April 26, 2012 closing. Green Tree and Bank of America's position also ignores the fact that Harbor Title's representative testified that she sent an initial wire transfer immediately following the April 26 closing, but that wire transfer failed. (Sadik Dep. 30:14-17.)

### B.  MALICIOUS PROSECUTION AGAINST BANK OF AMERICA

Bank of America argues there is no showing of any legal malice in this case, because Bank of America was justified in filing for foreclosure. According to Bank of America, its foreclosure

---

[3] Bank of America's assertion in its Brief that it instructed or notified the Zaskeys of these issues and requirements is misleading. Bank of America's own affidavit notes that those communications were sent to Harbor Title, not the Zaskeys. (D.E. 207-1, ¶28-31, 33.) Bank of America's entire argument is based on the faulty premise that Harbor Title was the Zaskeys' agent, when with respect to its functions as a closing agent, Harbor Title was taking every direction from Bank of America.

action "represents BANA's rights under the Note and Mortgage to commence a legal proceeding against the ZASKEYS for their continued default under same." (D.E. 253, p. 21.) This argument fails because Bank of America had no legal right to commence a proceeding under the note and mortgage. When Bank of America rejected the wire transfer on August 16, 2012 and sent the $26,788.44 back to Harbor Title, Bank of America was in breach of the CSSA. Bank of America cannot now claim that the loan had not been repaid, when it had in its possession the very proceeds it and Fannie Mae agreed to receive in satisfaction of the loan, and which proceeds Fannie Mae ultimately used to satisfy the loan[4].

### C. VIOLATIONS OF THE FCCPA AGAINST BANK OF AMERICA AND GREEN TREE

In their Response Briefs, Bank of America and Green Tree argue the Zaskeys' FCCPA claim is inapplicable because the underlying loan was not a consumer debt. (D.E. 253, p. 21; D.E. 254, p. 7.) This argument fails, as it represents a complete misrepresentation of Mr. Zaskey's deposition testimony. The summary judgment record demonstrates that the subject loan was *not* for commercial purposes, but was primarily for Mr. Zaskey's "personal, family or household" purposes. (G. Zaskey Dep. p. 18-21.) The Zaskeys' underlying motion also provides applicable law and citations to the record which demonstrates that the Counter-Defendants arguments on the FCCPA claim have no merit. (See D.E. 237.)

### D. VIOLATIONS OF THE FDCPA AND RESPA AGAINST GREEN TREE.

Throughout its Response, Green Tree argues that its "alleged collection activities were still proper because Green Tree was never advised by BOA that there was an authorized short sale of the Mortgaged Property and instead was repeatedly told by BOA that there had not been any authorized short sale." (D.E. 254, p. 4.) This is a defense that is completely unsupported by applicable law. Moreover, it certainly does not excuse those collection activities that violate the

---

[4] See *Mori v. Matsushita Elec. Corp. of Am.,* 380 So. 2d 461, 464 (Fla. 3d DCA 1980), citing *Sullivan v. McMillan,* 26 Fla. 543, 8 So. 450 (1890)(". . . where the contract is being performed, and one of the parties notifies the other unequivocally that he will not perform or further perform his part, or will not accept performance by the other, the latter may treat the contract as put to an end or entirely broken by the former, and, if ready and willing to perform his part, sue him at once for an entire breach of contract . . .")

FDCPA (which is a strict liability statute[5]) or those collection activities that took place after Mr. Zaskey provided actual notice to Green Tree. (Decl of G. Zaskey, D.E. 204, ¶24-25, and D.E. 142, Ex X and Y.) At best, Green Tree has demonstrated it may have a potential cross-claim against Bank of America.

Green Tree's argument that it has no record of receiving Mr. Zaskey's QWRs, and thus did not become aware of the illegitimacy of the debt until much later, also fails. (D.E. 254, p.8 and 15.) The excuse that Green Tree did not receive the QWRs finds no support under applicable case law[6]. Here, Mr. Zaskey's declaration contains the necessary foundation that the letters were sent, and he in fact retained copies of his handwritten QWRs for this very reason. (Decl of G. Zaskey, D.E. 204, ¶24-25.)

### E. GREEN TREE'S AFFIRMATIVE DEFENSES DO NOT RENDER SUMMARY JUDGMENT IMPROPER.

As a final matter, Green Tree argues that the Zaskeys cannot obtain summary judgment, because Green Tree raised a "bona fide error" affirmative defense. (D.E. 254, p. 2.) First, that affirmative defense would only apply to the Zaskeys' FDCPA and FCCPA claims, not the other remaining claims in this case, and it has no application to the Zaskeys' RESPA claim.

Second, the defense itself is not properly maintained. Federal courts require defendants to plead the bona fide error defense with particularity. See, e.g., *Walters v. Performant Recovery, Inc.,* 124 F. Supp. 3d 75, 2015 U.S. Dist. LEXIS 110724, 2015 WL 4999796, *4 (D. Conn. 2015) ("[B]ecause the bona fide error defense rests upon mistake, the circumstances surrounding the mistake must be stated with particularity. ... [T]o satisfy Rule 9(b), the defense must articulate 'who, what, when, where, and how' the bona fide error occurred.") (citations and internal quotation marks omitted).

---

[5] See *McCorriston v. L.W.T., Inc*., 536 F. Supp. 2d 1268, 1279 (M.D. Fla. 2008)(noting that under the FDCPA, a debtor is not required to prove the debt collector had "actual knowledge" that the underlying debt was not authorized or was invalid.

[6] See *Claude v. Wells Fargo Bank, N.A*., No2015 U.S. Dist. LEXIS 133142 (D. Conn. Sep. 30, 2015) (applying the "mailbox rule" and noting that "a letter shown to be properly addressed and mailed raises a rebuttable presumption of receipt."); *In re Residential Capital*, 533 B.R. 874, 879 (Bankr. S.D.N.Y. 2015) (finding that an absence of a corresponding entry in loan servicing notes that included entries for all other written communications from the plaintiff was insufficient to rebut the presumption that the defendant had received the missing letter.)

Green Tree seeks to create an insurmountable burden on the part of the Zaskeys, as Green Tree has yet to advise this Court or the Zaskeys as to what "bona fide error" was actually committed. (See D.E. 151, p. 14-15, Affirm Def. #1 and #3.)

**WHEREFORE**, in view of the foregoing, the Counter-Plaintiffs request this Court enter an order entering summary judgment in the Zaskeys' favor, as requested in their pending motion for summary judgment (D.E. 237).

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via U.S. Mail and/or E-mail and/or CM/ECF on this the <u>15th</u> day of August, 2016 to: Liebler, Gonzalez & Portuondo, Attorneys for Bank of America, N.A., Courthouse Tower, 25th Floor, 44 West Flagler Street, Miami, FL 33130, service@lgplaw.com; bg@lgplaw.com; sqr@lgplaw.com; akg@lgplaw.com; mkv@lgplaw.com; Shutts & Bowen, LLP, JBustard@shutts.com; Harbour Land Title, LLC, c/o Zahera Sadik, 11301 Okeechobee Blvd, Suite 1A, Royal Palm Beach, FL 33411, VIA EMAIL: zee@harborlandtitle.com; Cohen, Norris, Wolmer, Ray, Telepman & Cohen, VIA EMAIL: jst@fcohenlaw.com

Respectfully Submitted,

Law Offices of Daryl L. Jones, P.A.
14707 South Dixie Hwy., Ste 101
Miami, FL 33176
Tel: 888-328-5942
djones@DLJonesLaw.com
fkhan@DLJonesLaw.com
eromanowski@DLJonesLaw.com

By: **/s/ Faequa A. Khan**_____
☐ Daryl L. Jones, Esq./FBN.: 742589
■ Faequa A. Khan, Esq./FBN.: 100278

Page 11